(102° N. W. 1134.)

---

BEIDLER & ROBINSON LUMBER COMPANY, A CORPORATION, v. THE COE COMMISSION COMPANY, A CORPORATION.

Opinion filed February 21, 1905.

**A Contract for Future Delivery of Grain or Other Property Is Valid When Such Delivery Is Intended, Otherwise It Is a Wager and Void.**

1. A contract for the sale of grain or other property to be delivered at a future date is valid only when the parties really intend and agree that the property is to be delivered by the seller and paid for by the buyer at the contract price. If the real intent is not to deliver, but to settle upon the difference in market quotations, the transaction is a mere wager, and is void.

**Option Contracts — Evidence.**

2. When the validity of a contract of sale for future delivery is involved, and it is shown that in numerous other and similar transactions no deliveries were made, but that settlements were made upon differences in market quotations, the person relying upon the validity of such a contract must make it satisfactorily and affirmatively appear that the contract was made with a view to actual delivery.

**Gambling Transactions.**

3. On an examination of the evidence, it is *held* that in making the contracts of sale involved in this case there was no intention to make delivery, and that they were mere wagers upon the rise and fall of prices, and therefore void.

Appeal from District Court, Cass county; *Pollock, J.*

Action by the Beidler & Robinson Lumber Company against The Coe Commission Company. Judgment for plaintiff, and defendant appeals.

Affirmed.

*George D. Emery,* for appellant.

There must be a concurrence of both the contracting parties of the unlawful purpose or the contract will not be void. If one acts in good faith it is valid. Mohr v. Miesen, 49 N. W. 862; McCarthy v. Weare Com. Co., 91 N. W. 33; Donovan v. Daiber, 82 N. W. 848.

The court erred in granting plaintiff's motion, after verdict, and ordering judgment in its favor, notwithstanding the verdict, and in entering judgment for the plaintiff. It is only where there is no substantial evidence to sustain the verdict and the moving party is hence entitled to a judgment as a matter of law, that the motion can be granted. Kerman v. St. Paul City Ry. Co., 67 N. W. 71; Manning v. City of New Orleans, 60 N. W. 953; Slivitske v. Town of Wien, 67 N. W. 730; Cruikshank v. St. Paul F. & M. Ins. Co., 77 N. W. 958; Marguardt v. Hubner, 80 N. W. 617; Netzer v. City of Crookston, 68 N. W. 1099; Kreuzer v. Great Northern Ry. Co., 86 N. W. 413; United States Fidelity & Guaranty Co. v. Seigman, 91 N. W. 473; Jacobson v. Johnson, 91 N. W. 465; Isherwood v. Jenkins Lbr. Co., 92 N. W. 230; Clark v. Dayton, 92 N. W. 327; Jumiska v. Andrews, 92 N. W. 470; Lauritsen v. Amer. Bridge Co., 92 N. W. 475; Sheely v. Duffy, 61 N. W. 295; Conover v. Knight, 65 N. W. 371.

It was shown that not one single contract was carried by the customer to the date of maturity, nor was delivery intended or demanded by any customer, but the contracts were voluntarily settled by them or by the course of the market, before maturity. The fact that no deliveries were made is not evidence that the contracts were wagers and hence void. The evidence showed—without dispute—that it was defendant's custom to deliver the articles contracted for in every case where the contract matured, either by lapse of time or by demand under terms of the contract. Such contracts are valid in law. Van Dusen-Harrington Co. v. Jungeblut, 77 N. W. 970; Donovan v. Daiber, supra.

Where the evidence tends in any way to establish the cause of action or defense it is error to take the case from the jury or direct a verdict. Drakely v. Gregg, 75 U. S. 242, 19 L. Ed. 409; Hickman v. Jones, 76 U. S. 197, 19 L. Ed. 551; Baylis v. Travelers Ins. Co., 113 U. S. 316, 28 L. Ed. 989; Young v. Ege, 65 N. W. 249; Hamburg v. St. Paul F. & M. Ins. Co., 71 N. W. 388; Longley v. Daly, 46 N. W. 247; Stocklam v. Cheeney, 28 N. W. 692; Benham v. Purdy, 4 N. W. 133; Marcott v. Marquette H. & O. Ry. Co., 10 N. W. 53; Houck v. Gue, 46 N. W. 280; Star Wagon Co. v.

Matthiessen, 14 N. W. 107; Knapp v. Sioux Falls Nat. Bank,. 40 N. W. 587; Sperry v. Etheridge, 19 N. W. 657; Citizens Bank v. Rhutasel, 25 N. W. 261; Fox v. Spring Lake Iron Co., 50 N. W. 872; Jamison v. McFarland, 74 N. W. 1033; Sweet v. Chicago, M. & St. P. Ry. Co., 60 N. W. 77; Suiter v. Park Nat. Bank, 53 N. W. 205; Haugen v. Chicago, M. & St. P. Ry. Co., 53 N. W. 769.

*F. W. Ames* and *Morrill & Engerud,* for respondents.

The test of the legitimacy of the transactions herein involved is whether both parties at the time that they were had, contemplated and intended to actually deliver and receive the commodity dealt in, or merely intended to "settle differences" based upon fluctuations of the market. Dows v. Glaspel, 4 N. D. 251, 60 N. W. 60; Irwin v. Wiliar, 110 U. S. 499, 28 L. Ed. 225; Lowe v. Young, 13 N. W. 329; Mohr v. Meisen, 49 N. W. 862; Barnard v. Blackhaus, 6 N. W. 252, 9 N. W. 595; Sprague v. Warren, 41 N. W. 1113; Rogers v. Marriott, 82 N. W. 21.

The court must determine whether the form is genuine or a mere cloak to conceal illegality. Dows v. Glaspel, 4 N. D. 251; Barnard v. Blackhaus, 6 N. W. 252, 9 N. W. 595; Sprague v. Warren, 41 N. W. 1113; Rogers v. Marriott, 82 N. W. 21.

In the face of all the conceded facts and circumstances, and especially the fact that defendant habitually made it a practice to settle differences with its customers and actual deliveries were made only in an infinitesimally small percentage of transactions, the presumption arises that the defendant intended to do just what it did—settle differences. The burden shifts to the defendant to rebut this presumption and show that deliveries were actually intended when the deals were made. Barnard v. Blackhaus, 9 N. W. 595; Sprague v. Warren, 41 N. W. 1113; Rogers v. Marriott, 82 N. W. 21; Board of Trade v. L. A. Kinney Co., 125 Fed. 72; Sharp v. Stalker, 52 Atl. 1120.

If there was any difference of opinion as to the conclusion to be drawn from the undisputed evidentiary facts, we next maintain that the defendant is concluded by the trial court's decision on that question. Both parties moved for a directed verdict on the evidence, and thereby requested and consented to a decision by the court. New England Mortgage Co. v. Great Western Elevator Co., 6 N. D. 407; 71 N. W. 130; Stanford v. McGill, 6 N. D. 536; 72 N. W. 938; First M. E. Church v. Fadden, 8 N. D. 152, 77 N. W. 615.

If there was a scintilla of evidence tending to support any other conclusion than the one adopted by the court, it was so extremely slight, that no jury mindful of the law and facts would be warranted in accepting it. Under such circumstances a directed verdict was proper. Rogers v. Marriott, 82 N. W. 21; Woolsey v. C. B. & Q. Ry. Co., 58 N. W. 444; Elliott v. Chicago, M. & St. P. Ry. Co., 150 U. S. 245, 14 Sup. Ct. Rep. 85; Vanderford v. Foster, 65 Cal. 49, 2 Pac. 736; Jackson v. Haedin, 83 Mo. 175; Deyo v. New Central Railway Co., 34 N. Y. 9, 88 Am. Dec. 418.

If the directed verdict was proper, it follows that under the circumstances of this case, which did not involve any alleged technical failure of proof of some material fact, the court should order judgment notwithstanding the verdict. Richmire v. Andrews & Gage Elev. Co., 11 N. D. 453, 92 N. W. 819; Baxter v. Covenant Mut. Life Ass'n, 83 N. W. 459; Merritt v. Great Northern Ry. Co., 84 N. W. 321.

If the court could properly have directed a verdict, it could also order a judgment. Calteaux v. Mueller, 78 N. W. 1082; Gammon v. Abrams, 10 N. W. 479; Dowagiac Mfg. Co. v. Schroeder, 84 N. W. 14; Baxter v. Covenant Mut. Life Ass'n, 85 N. W. 459; Merritt v. Great Northern Ry. Co., 84 N. W. 321.

When the trial court is of the opinion that a verdict is against a clear preponderance of the evidence, it is its duty to set aside the verdict and order a new trial. It should exercise this discretionary power even though there is a clear conflict of evidence. Pengilly v. J. I. Case Threshing Mach. Co., 11 N. D. 249, 91 N. W. 63; Gull River Lumber Co. v. Osborne-McMillan Elev. Co., 6 N. D. 276, 69 N. W. 691; 14 Enc. Pl. & Pr., p. 770, note 3.

The motion being in the alternative, it is clear that even if the trial court was in error in ordering judgment, a new trial must necessarily follow. Cruikshank v. St. Paul F. & M. Ins. Co., 77 N. W. 958; Kreatz v. St. Cloud School District, 81 N. W. 533; Jones v. Chicago, St. P. M. & O. Ry. Co., 83 N. W. 446; Nelson v. Grondahl, 12 N. D. 130, 96 N. W. 299.

The action was for money had and received. The plaintiff claims that the defendant received its money from Carter, who embezzled it. The defendant must restore the money unless it received the same in good faith and for value. If the money was received as the result of an illegal transaction, it was not received in good faith for value. Ervin v. State, 48 N. E. 249; 2 Perry on Trusts, section

828; 1 Perry on Trusts, section 245; Pearce v. Dill, 48 N. E. 788; Pierson v. Fuhrman, 27 Pac. 1015.

*George D. Emery,* for appellant in reply.

We insist that the weight of the testimony; the credence to be given to it; the fact of "intent" as disclosed by it; the conclusion to be based upon it as to whether or not the contract was a valid one under the instructions given them, were all proper for the jury to consider and determine, and the court, having refused to direct a verdict and the evidence being conflicting, their conclusion cannot now be disturbed. Broad v. Leck, 48 Ill. App. 390; Ream v. Hamilton, 15 Mo. App. 577.

Where the testimony is such that reasonable minds may draw different conclusions from it, the question is eminently one for the jury. Standard L. &. A. Co. v. Thornton, 100 Fed. 582; C. &. G. W. Ry. Co. v. Price, 97 Fed. 423; Cruikshank v. Bank, 26 Fed. 584; Young v. Ege, 65 N. W. 249.

Where the defendant pleads and gives evidence tending to prove a complete defense, it is error for the court to take the case from the jury. Hamberg v. St. Paul F. & M. Ins. Co., 71 N. W. 388.

A motion for a directed verdict asks the court to decide that there is no evidence to support a contrary contention. If made by the plaintiff and denied, it must be because the court concludes that there is some evidence in support of the claims of the defendant. Then, after such motion and denial, if the defendant moves for a directed verdict in his favor on the ground that there is no evidence to establish the claim of the plaintiff, how does he thereby consent that the court may decide upon the weight of any evidence that may be in the case, whose motion it has just denied? Rogers v. Marriott, 82 N. W. 21; Press et al. v. Duncan, 69 N. W. 543; Cunningham v. Reichart, 72 N. W. 490; New England, Mortgage Security Co., v. Great Northern Elevator Co., 71 N. W. 130, 6 N. D. 407.

Young, J. Plaintiff brings this action to recover the sum of $8,667.71, which it claims its agent, one F. H. Carter, appropriated from its funds and paid to the defendant in a series of gambling transactions. At the close of the testimony both parties moved for a directed verdict. Both motions were denied. The jury returned a verdict for the defendant. Thereafter the plaintiff moved

upon the minutes for the judgment notwithstanding the verdict, or for a new trial. The motion for judgment was granted for the full amount claimed, and the defendant appeals from the judgment.

The defendant assigns error upon the denial of its motion for a directed verdict, and upon the order for judgment for plaintiff. The case turns upon a single question, and that is whether the transactions in which the defendant received the plaintiff's money were legitimate, or were gambling transactions. As to all other facts which are material to plaintiff's right to recover, there is no conflict in the testimony.

The plaintiff is a corporation engaged in the lumber and fuel business, with its home office and principal place of business in the city of Mayville. For a number of years it had a branch office and place of business at the city of Casselton, which was under the charge of F. H. Carter, who, as agent and local manager, transacted all of its business at that point, and had the custody of its funds. The defendant, the Coe Commission Company, which is a Minnesota corporation, has its home office in the city of Minneapolis, and has a large number of branch offices in various cities of the United States. Its ostensible business is buying and selling grain, produce, stocks, and bonds for future delivery. During the times here in question it had an office at the city of Casselton, in charge of one R. S. Sparks. Between the 1st day of March, 1902, and the 1st day of May, 1903, plaintiff's agent, Carter, took from the moneys in his custody various amounts, aggregating in all $8,667.75, and paid the same to the defendant's agent, Sparks, in settlement of certain alleged purchases and sales of stocks and grain. The plaintiff had no knowledge that Carter was using its funds, or that he was engaged in the transactions in which the money was lost.

The plaintiff's contention is that the evidence shows conclusively that the transactions in which the defendant received its money were gambling transactions. Defendant contends, on the other hand, that they were legitimate trades, or, at least, that the evidence is such that it was for the jury to say whether they were legitimate or were gambling transactions, and that the verdict for the defendant should not therefore be set aside. There is practically no dispute as to the manner in which the defendant conducted its business at Casselton and elsewhere, or as to the particular transactions with plaintiff's agent. The testimony on this point is furnished by Carter and Sparks,

and by one Barry, who was defendant's vice president and head bookkeeper at its home office at the city of Minneapolis, and their testimony differs in no important particular. The defendant's office in Casselton was connected by a private wire with the home office at Minneapolis, and it exhibited on a blackboard in its Casselton office the Chicago and Minneapolis market quotations of grains, produce, stocks, under appropriate headings. Upon the basis of these quotations the customer would give his order to the local agent for an alleged purchase or sale of grain or other commodity for future delivery. The local agent would wire the order to the home office in Minneapolis, and the latter at once (usually from one to five minutes later) wired its acceptance of the trade. The defendant also mailed to its local agent, for delivery to the customer, a written, but unsigned, statement or "confirmation" of each transaction, ostensibly showing what the trade was. This so-called "confirmation" contained the following: "Notice:  *  *  *  We hereby agree to receive all property sold to us or through us and to deliver all property bought from us or through us at maturity of contract, and we will not accept business under any other condition, and the trade below recorded is made with this understanding. We also reserve the right to close any trade with us, or through us, without notice, if the money in our hands is in our judgment insufficient to protect the trade.  *  *  *"  The defendant's rules required the customer to deposit a margin of $2 per share on stock, 1 cent per bushel on grain, and 25 cents per barrel on pork, whether the customer purchased or sold. On each sale of grain the customer paid one-eighth of a cent per bushel, which was called "commission." When the sales were closed out on the day of the trade, payments of margins in advance was not usually exacted. When the fluctuations in price exceeded the margin, the customer was required to put up further margins, or his deal was closed out. Settlements were made whenever the customer wished, and were based upon the market quotations upon the blackboard. If the price had advanced, the customer was paid the difference between the quotations when the trade was made and the quotation at the time of the settlement. If the price had fallen, the depreciation was charged against the amount he had put up as margin.

The decisive question in this case is whether the parties intended an actual delivery of the commodities in which they purported to deal. If they did, the transactions were legitimate. If they did not,

they were gambling transactions. The law applicable to such transactions is well settled. "A contract for the sale of goods to be delivered at a future date is valid, even though the seller has not the goods, nor any other means of getting them than to go into the market and buy them; but such a contract is only valid when the parties really intend and agree that the goods are to be delivered by the seller, and the price paid by the buyer. If, under the guise of such a contract, the real intent be merely to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager, and is null and void." Irwin v. Williar, 110 U. S. 499, 4 Sup. Ct. 160, 28 L. Ed. 225. See, also, Dows v. Glaspel, 4 N. D. 251, 60 N. W. 60, and cases cited.

The only question of difficulty in cases of this character is to determine what the parties really intended; that is, whether at the time the trade was made they intended in good faith to deliver and receive the commodity which was the subject of their alleged sales, or whether they in fact had no such purpose, but, on the contrary, intended to settle upon a basis of difference in market quotations. What are the facts in this case? It stands undisputed that no deliveries were made by or to Carter of any of the commodities which were the subject of his trades, which were probably 500 in number. No deliveries were ever made by or to any of the defendant's customers at Casselton during the two years in which it maintained an office in that city. In each instance, settlement was made by paying or receiving the difference in price at the market quotation at the time of the settlement. As previously stated, the character of such transactions—that is, whether they are legitimate or gambling transactions—depends upon the intention of the parties as to delivery. It is apparent that this intention, when called in question, must be ascertained from the transaction itself, the facts and circumstances attending it, and the defendant's general manner of doing business, including other transactions of a similar nature. This must be true, for. it is the general course of one business which classifies it, and "ordinarily men are presumed to intend to do what they do in fact do." Bryant v. Western Union Telegraph Co. (C. C.) 17 Fed. 825; Board v. Kinsey Co. (C. C.) 125 Fed. 72; Sharp v. Stalker (N. J. Ch.) 52 Atl. 1120. Furthermore, it is held, and upon sound reason,

that when the validity of a contract for the future delivery of grain, which has been settled without delivery and by a payment of the defference in market quotations, is involved, and it is made to appear that there was no delivery in numerous other trades, and that deliveries were the exception, and settlements upon the basis of market quotations were the rule, "it is not too much to require a party claiming rights under it to make it satisfactorily and affirmatively appear that the contract was made with an actual view to the delivery and receipt of the grain, and not an evasion of the statute against gaming, or as a cover for a gambling transaction." Barnard v. Backhouse (Wis.) 9 N. W. 596; Sprague v. Warren (Neb.) 41 N. W. 1113, 3 L. R. A. 679.

Has the defendant made it "satisfactorily and affirmatively" appear that its trades with Carter were "made with an actual view to the delivery and receipt of the grain?" This question must be answered in the negative. In our opinion, the evidence is such that reasonable minds can draw but one conclusion, and that is that no delivery was intended. The fact that 500 trades were made with Carter without a single delivery, and that there were no deliveries in any of the trades made at Casselton during the entire time defendant did business there, would seem to be conclusive upon this question. Further proof, however, to the same effect, and of a most convincing character, is found in the fact that no preparation was made by either buyer or seller to deliver or to receive the property which was the subject of these trades, and in the further fact that the defendant in no instance made inquiry as to the financial standing of its customers, or of their ability to carry out the alleged purchases and sales. The trades were made solely in reliance upon the margin in the defendant's hands, and with a view to a settlement upon a basis of difference in market quotations, and not in reliance upon the customer's ability to deliver the commodity in case of a sale, or pay for it in case of a purchase. It is needless to say that good faith contracts of sale for future delivery are not made in this way. The testimony of Barry, the defendant's vice president, that in 230 trades at other points deliveries were made, raised no issue of fact as to the intent in this case, for it was shown upon his cross-examination that these were the only deliveries made by the defendant in all of its 170 branch offices in more than two years, and out of a total of more than 120,000 trades; in other words, there were 520 settlements upon the difference in market quotations, and with-

out delivery, to one settlement by actual delivery, which shows that delivery was the exception and very rare exception at that, and that settlements on market quotations were the almost universal rule; and there is no evidence to mark the transactions here in question as exceptions. Applying the maxim that "men intend to do what they do in fact do," it shows that no delivery was intended, and this is in entire accord with all the other evidence in the case. The question at issue is the intent of the parties, and upon this the evidence all points in one direction, and conclusively shows that the statement in the "confirmation" that the trade was made with a view to actual delivery was in fact false, and a mere cover for a gambling transaction. The trial court erred, therefore, in denying plaintiff's motion for a directed verdict. This error was properly corrected by granting the motion for judgment notwithstanding the verdict.

Judgment affirmed.

MORGAN, J., concurs. ENGERUD, J., having been of counsel, took no part in the decision of this case.

(102 N. W. 880.)

NOTE.—Judgment notwithstanding the verdict is ordered only when a motion for a directed verdict has been previously made and denied. Johns v. Ruff, 12 N. D. 74, 95 N. W. 440.

Judgment non obstante is granted only when it appears from the evidence that the party making the motion is entitled to it as a matter of law upon the merits. Aetna Indemnity Co. v. Schroeder, 12 N. D. 110, 95 N. W. 436. Where there is an issue for the jury, judgment non obstante will not be granted. Nelson v. Grondahl, 12 N. D. 130, 95 N. W. 299. Failure to unite a motion for new trial with one for judgment non obstante does not waive the former. Id. But see Pine Tree Lumber Co. v. City of Fargo, 12 N. D. 360, 96 N. W. 357.

On reversal in Supreme Court of a judgment notwithstanding the verdict, the cause will be remanded to the district court, with leave to the respondent to perfect a motion for a new trial, in cases where he has asked for a new trial in connection with the motion for a judgment notwithstanding the verdict. Nelson v. Grondahl, 13 N. D. 363, 100 N. W. 1093. To justify a judgment notwithstanding the verdict, the verdict must not only not be justified by the evidence, but it must also appear that there is no reasonable probability that the defects in the proof necessary to support the verdict may be remedied on another trial. Meeham v. Great Northern Ry. Co., 13 N. D. 432, 101 N. W. 183; Richmire v. Andrews & Gage Elevator Co., 11 N. D. 453, 92 N. W. 918.